UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JOE ANGEL NORIEGA, | ) | 1:08-CV-01491 LJO GSA HC |
| | ) | |
| Petitioner, | ) | FINDINGS AND RECOMMENDATION |
| | ) | REGARDING PETITION FOR WRIT OF |
| v. | ) | HABEAS CORPUS |
| | ) | |
| | ) | |
| L. E. SCRIBNER, Warden, | ) | |
| | ) | |
| Respondent. | ) | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

**BACKGROUND**

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Fresno, Hon. Hilary A. Chittick presiding, following Petitioner's conviction by jury trial on August 4, 2006, of two counts of forcible rape with use of a deadly weapon, two counts of forcible rape, one count of forcible oral copulation with use of a deadly weapon, one count of second degree robbery, and one count of assault with a deadly weapon. See California Court of Appeal Opinion ("Opinion"), attached to Petition. On August 31, 2006, Petitioner was sentenced to a total indeterminate term of 55 years to life. Id.

Petitioner appealed to the California Court of Appeals, Fifth Appellate District (hereinafter "Fifth DCA"). On August 21, 2007, the Fifth DCA affirmed the judgment. Id. Petitioner then filed a

petition for review in the California Supreme Court. The California Supreme Court summarily denied the petition.

On September 26, 2008, Petitioner filed the instant federal habeas petition. On December 18, 2008, Respondent filed an answer to the petition. Petitioner did not file a traverse.

**FACTUAL BACKGROUND**

*Facts Underlying the Offenses against I.P.*

At 11:00 a.m. on August 25, 2004, 18-year-old I.P. was sitting at a bus stop near the Manchester Center shopping mall in central Fresno. Appellant sat down next to her and began a conversation. Appellant said he had just ridden on the bus she had been on earlier and that he was a student at Fresno City College (FCC). Appellant showed a "drop/add" form from FCC bearing the handwritten given name "Angel" and the surname of either "Ramirez" or "Martinez." Appellant asked I.P. whether she wanted to buy some "weed" (marijuana) and I.P. declined. Appellant said he had some weed but she never saw any in his possession. I.P. was new to Fresno and had never ridden the bus before that day. Appellant offered to show her the location of the stop for the next bus she needed to take.

Appellant and I.P. left the bus bench and began walking. She accompanied appellant because he offered to show her where to catch the correct bus. On cross-examination, she initially testified she also accompanied him because he offered her marijuana. However, moments later she said she did not want any marijuana from appellant. They walked along the edge of a canal bank for about five minutes. At one point, they stopped walking and had a conversation. I.P. said she had a strong feeling something was going to happen. Appellant suddenly grabbed her by the right arm and threw her into a small, fenced area behind an apartment complex. He then demanded her money, took off her backpack, and threw the contents of the pack around. Appellant looked in her purse and wallet but found only a dollar or two.

I.P. began to fight back and resist appellant because she did not have any money to give him. Appellant hit her in the face, forehead, and nose multiple times with his fist. I.P. punched appellant back in an effort to escape. He threw her to the ground or knocked her to the ground with a punch. I.P. and appellant struggled on the ground until he pulled out a red-handled knife and she stopped resisting. I.P. later testified that appellant produced the knife just before he inserted his penis inside her vagina.

Appellant told I.P. to get off of the ground and to remove her pants. She pulled her blue jeans down to her ankles and knees. Appellant crouched on his knees in front of her, ripped off her undergarments, and masturbated to gain an erection.[FN1] Appellant climbed on top of I.P., pulled her legs apart, inserted his penis into her vagina, and engaged in nonconsensual sexual intercourse with I.P. for at least five minutes. Appellant threatened to "shank" I.P. if she did not close her eyes. She complied and kept asking appellant if he was going to kill her. I.P. testified she thought her life was over at the time of the incident. Appellant told her that she better shut up because her parents were going to see her dead in a ditch on the morning news. At one point, I.P. asked whether appellant was going to kill her and appellant replied by saying he was not going to "shank" her.

FN1. I.P. told an investigating officer that appellant cut off her underwear with a knife and that the underwear stayed around her waist during the entire incident. She said appellant inserted his penis into her vagina through an open space in the underwear.

Appellant eventually removed his penis from I.P.'s vagina and told her to give him oral sex. She complied but gagged on appellant's penis. Appellant then reinserted his penis into her vagina and had sexual intercourse with her for another five to 10 minutes. During sexual intercourse, appellant held her down by keeping the knife at her throat. She believed appellant partially ejaculated in her vagina and partially on her shirt during the second penetration. She thought there was a spot of semen on her shirt.

When appellant finished assaulting I.P., he allowed her to get up and she pulled up her pants. He helped her gather the contents of her purse that had been thrown around. However, he took her Social Security and California Identification cards and said if she went to the police, he knew where she lived and he would come to kill her. I.P. made her way to a nearby AT & T store and used a telephone to summon a friend. I.P. then went to Saint Agnes Medical Center where medical personnel examined her, collected semen samples from her body, and took her clothing for analysis.

Sexual assault nurse Dina Wells examined I.P. on the evening of the offenses and documented bruises to her arms and back, dirt and redness of the skin on her back, and bruises along the hairline of her forehead. She also noted petechia (pinpoint bruises) on the back of her throat, dirt in her cervix, and tenderness in her vagina.

As a result of the sexual encounter with appellant, I.P. suffered bruises to her arms, bruises and swelling to her forehead, bumps on her head, black-and-blue eyes, and scratches to her back. She could not brush her hair because of soreness and swelling. She believed that appellant may have pulled her hair at some point. A partially eaten McDonald's chicken sandwich was among the many things appellant threw from I.P.'s purse. Police officers later found the sandwich at the scene.

*Facts Underlying the Offenses against A.N.*

On the afternoon of September 22, 2004, 17-year-old A.N. was talking to her boyfriend on a pay telephone while waiting for a bus. The phone was located near the bus stop at Palm and McKinley Avenues in Fresno. The bus arrived and she ran to it, but the bus departed before she could get on. She walked back to the pay telephone and called her boyfriend again. While she was on the telephone, appellant approached A.N. and asked her the time. At first she waved him off and completed her call. When the call was done, A.N. told appellant the time and they began a conversation.

Appellant asked A.N. for her name and whether she wanted to smoke some weed. At trial she could not recall her response but denied saying she wanted to smoke weed. Appellant told A.N. he was going to Fresno State or FCC. He told A.N. she was beautiful, that she should be a model, and that he was getting paid for attending school. At one point, he told A.N. his name was Jokey. A.N. began walking with appellant down McKinley Avenue toward the intersection with Fruit, where there was another bus stop. Appellant walked with A.N. at first but then trailed behind her after she decided to walk separately.

A.N. eventually turned into an alley off of McKinley Avenue to get away from appellant. When she was almost halfway down the alley, appellant swung A.N. by the arm from behind and threw her to the ground. She ended up on her back and appellant kneeled on top of her. He unbuttoned his pants, forcibly took her jeans off or down below her buttocks, and pulled her underwear down. Appellant touched her breasts, masturbated, and rubbed himself on her body. He then got on top of A.N.'s body, put his penis inside her vagina, and had nonconsensual sexual intercourse with her. A.N. did not know how long the intercourse lasted or whether appellant ejaculated. She was crying at the time. At one point during the sexual activity, a bicyclist passed by at the end of the alley. A.N. looked at the person and appellant asked whether she really thought they were going to see or hear her.

After engaging in intercourse, appellant got up, A.N. pulled up her undergarments and pants, and she got to her feet. At this time, she grabbed onto appellant's shirt, reached into his pocket, and tried to grab something bearing his name for evidence. He called her a "bitch," told her he would hit her, and said she was stupid. As appellant started to leave the alley, A.N. said she had a cell phone and would be calling the police. Appellant then ran away from the scene.

A.N. went to a nearby 7-Eleven store and used a pay telephone to call her boyfriend. A store attendant asked whether she was all right and A.N. said she had been attacked. A.N.'s boyfriend arranged for a cousin to pick her up and take her to his uncle's home. When the uncle asked what had happened, A.N. explained the sequence of events and he contacted the police. She did not want to tell what had happened because she did not want her mother to find out. Although she was embarrassed and nervous, she ultimately told officers what had happened. The officers took A.N. to University Medical Center for examination. Nurse Cynthia Felix examined A.N. and collected semen samples, blood, swabs, fingernail scrapings, and pubic hair from her body. Medical personnel also took A.N.'s clothing for further analysis. Felix observed redness on A.N.'s cervix at the time of the examination.

A.N. admitted serving time in juvenile hall in 2005 for being an accessory after the fact to a felony. On cross-examination, she denied that appellant offered her marijuana to smoke and that was the reason they walked to the alley. She also denied that appellant showed her a bottle of "Extasy" pills and offered to exchange those pills for sex.

*Facts Underlying the Offenses Against D.B.*

On the afternoon of November 17, 2004, 14-year-old D.B. took the bus to Manchester Center and then began walking to her mother's home on Palm and Dakota Avenues. Appellant approached her near a McDonald's restaurant and asked her name. D.B. said she did not want to talk to him, ignored him, and continued walking. Appellant was persistent, told her she was pretty, and asked whether she had a boyfriend. He also asked where she was going. D.B. told appellant she was going to her mother's house. He asked to walk with her but she continued walking and ignored him. Appellant also asked whether she smoked weed. When D.B. said "yes," appellant offered her some and said his name was Angel.

D.B. began to speak with appellant after he offered her the marijuana. When he asked whether she wanted to get high, she replied in the affirmative. Appellant said he lived nearby and attended FCC. As they walked on Blackstone Avenue, appellant told D.B. he knew of a shortcut to her mother's house. They walked down some small streets in the direction of a nearby canal. At the canal, they crossed over and walked along the bank to a place where D.B. believed they could smoke marijuana. This was apparently the same place where appellant had his sexual encounter with I.P.

D.B. said an old bicycle was located in a fenced area. Appellant asked her to get the bicycle for him. When she complied, he pushed her back in the fenced area and told her that he would hurt her if she screamed. D.B. nevertheless screamed and appellant grabbed her arm, pushed her to the ground, and held his hand over her mouth. He also hit her in the face with his hand. Appellant told her he had a gun but she did not see a weapon. Appellant was carrying a book bag and he reached into the bag as if he had a gun stored there.

Appellant forcibly held D.B. on the ground. He unbuttoned and unzipped her pants and pulled them down below her knees. He said he had done this to two other women. D.B. told appellant she was only 12 years old and he acted as if he did not care. He told D.B. that meant she "must be tight." Appellant pulled down his pants and masturbated to create an erection. He then inserted his penis into her vagina and had nonconsensual sexual intercourse with her. While engaged in intercourse, appellant pulled down D.B.'s shirt and began kissing

and licking her breasts. The sexual activity lasted between 20 and 30 minutes and D.B. scratched appellant's wrists and arms. When appellant finished he wiped her vagina with his shirt. He ejaculated at some point but she was unsure whether he ejaculated inside of her. D.B. told an examining nurse that she thought he ejaculated on the surface between her legs. D.B. testified she saw a wet substance on appellant's shirt after the sexual conduct.

Appellant told D.B. that if she told anybody about what happened, he knew the area where she lived. Appellant took her shoes, underwear, and jeans and threw them over a fence in an apartment yard. He then left the scene on the bicycle. D.B. kicked down some fence boards, retrieved her clothes, and dressed in her outer garments. She put her underwear in her pocket.

During the encounter, some glitter, makeup, and cocoa butter fell out of her jacket pocket. She left behind some stockings that she had used to stuff her shoes. Police personnel later photographed these items in the apartment yard near the scene of the crime. D.B. left the scene and made her way back toward her mother's house. She ran into some friends as she walked near some railroad tracks. Her friends asked what was wrong and D.B. told them what had happened. She got in her friends' car and they drove around to look for appellant. When they were unable to find appellant, the friends took D.B. to her mother's apartment and they summoned police.

The police contacted D.B. and she was crying and shaking. She had dirt on her clothing and dirt, grass, and other debris in her hair. She had scratches on the top of her hands and on her face, nose, and chin. Officers took D.B. back to the crime scene and observed the items that she had left there. They next took her to University Medical Center for examination. Medical personnel collected semen samples from her body and took her clothing for further analysis. A medical examination revealed that D.B. had abrasions on her back, lower shoulder blade area, knees, and knuckles.

Valerie Caporale, a sexual assault nurse at University Medical Center, examined D.B. and said she was tearful but cooperative. Caporale said vaginal swabs and fingernail scrapings were taken from D.B.

*Additional Evidence*

I.P., D.B., and A.N. identified appellant as their assailant after viewing a photographic lineup prepared by the Fresno Police Department.

Laura Bailey-Van Houten, a criminalist with the California Department of Justice Regional Crime Laboratory in Fresno, testified about DNA evidence. She said blood was obtained from appellant for such analysis. DNA was obtained from I.P.'s clothing for purposes of comparison. According to Bailey-Van Houten, appellant could not be eliminated as the source of sperm found on I.P.'s clothing. Bailey-Van Houten tested nine different areas of DNA and appellant's DNA shared the same profile in every instance with the sperm found on I.P.'s clothing. According to Bailey-Van Houten, the chance of a random occurrence of that precise DNA profile in the Hispanic population was one in 520 billion.

Bailey-Van Houten also said appellant's DNA profile was consistent with sperm samples taken from D.B.'s body and clothing. Bailey-Van Houten said there were two different contributors to the sperm specimens found on the crotch area of D.B.'s jeans. D.B. advised authorities that she had borrowed the jeans from an older cousin. Bailey-Van Houten referred to the sperm contributors as the "major contributor" and the "minor contributor." According to Bailey-Van Houten, the major contributor was consistent with appellant's DNA. Bailey-Van Houten said appellant's DNA profile matched sperm samples taken from A.N. in 15 areas. In the case of I.P., the genetic markers in the sperm were expected to randomly

occur in one in approximately 520 billion Hispanics. In the cases of D.B. and A.N., the genetic markers in the sperm were expected to randomly occur in one in 180 quadrillion Hispanics.

Fresno police searched appellant's apartment and found a book bag. The bag contained a Fresno bus schedule and FCC paperwork bearing appellant's name. D.B. said the book bag looked exactly like the one appellant wore on his shoulder on the day he assaulted her. D.B. also identified a puffy, black jacket seized from appellant's apartment and said it was similar to the one he wore on the day of the incident.

A.N. testified the seized book bag looked like the one appellant was carrying on the day of their encounter. She told officers the book bag had an envelope on it bearing the word "north." Officers examined the bag and found a tag on the back bearing the word "Northwest."

During an interview with Fresno Police Detective Pam Kobashi, appellant denied knowing or having nonconsensual sexual intercourse with I.P., D.B., and A.N.. He maintained to officers that his DNA would not be found on the three girls. Appellant did not testify during the defense case. At closing argument, despite appellant's statements to Detective Kobashi, defense counsel argued that the circumstantial and physical evidence was "just as consistent with consensual sex as with forcible rape."

## DISCUSSION

**I. Jurisdiction**

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); <u>Williams v. Taylor</u>, 529 U.S. 362, 375 fn.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. In addition, the conviction challenged arises out of the Fresno County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 2241(d). Accordingly, the Court has jurisdiction over the action.

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. <u>Lindh v. Murphy</u>, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); <u>Jeffries v. Wood</u>, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* <u>Drinkard v. Johnson</u>, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* <u>Lindh v. Murphy</u>, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

## II. Legal Standard of Review

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death Penalty Act which became effective on April 24, 1996. Lockyer v. Andrade, 538 U.S. 63, 70 (2003). Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); see Lockyer, 538 U.S. at 70-71; see Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71, *quoting* 28 U.S.C. § 2254(d)(1). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id.

Finally, this Court must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

"[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. See Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

AEDPA requires that we give considerable deference to state court decisions. The state court's factual findings are presumed correct, 28 U.S.C. § 2254(e)(1), and we are bound by a state's interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir.2002), *cert. denied*, 537 U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

**III. Review of Petition**

Petitioner claims the trial court committed prejudicial error when it excluded relevant, favorable and possibly exculpatory evidence by limiting the defense cross-examination of the three victims.

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. am. VI. The Sixth Amendment's Confrontation Clause was made applicable to the states through the Due Process Clause of the Fourteenth Amendment. Pointer v. Texas, 380 U.S. 400, 403-05 (1965). The Confrontation Clause gives a defendant the right "to be confronted with the witnesses against him." Id. "[T]he Confrontation Clause guarantees only 'an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" Kentucky v. Stincer, 482 U.S. 730, 739 (1987), *quoting* Delaware v. Fensterer, 474 U.S. 15, 20 (1985). The Confrontation Clause does not prevent a trial

U.S. District Court
E. D. California    cd    8

judge from imposing "reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986); Crane v. Kentucky, 476 U.S. 683, 689-90 (1986). Nevertheless, the Court has held that a defendant's Confrontation Clause rights have been violated when he is "prohibited from engaging in otherwise appropriate cross-examination ... and thereby 'to expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness.'" Id. at 680, *quoting* Davis v. Alaska, 415 U.S. 308, 318 (1974).

This claim was presented on direct appeal to the Fifth DCA where it was rejected in a reasoned option. See Opinion, attached to Petition. The claim was then presented to the California Supreme Court where it was summarily denied. The California Supreme Court, by its "silent order" denying review of the Fifth DCA's decision, is presumed to have denied the claims presented for the same reasons stated in the opinion of the Fifth DCA. Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).

The appellate court rejected Petitioner's claim that the exclusion violated the Constitution, stating:

> As a general matter, the application of the ordinary rules of evidence does not impermissibly infringe on a defendant's right to present a defense. Although completely excluding evidence of an accused's defense theoretically could rise to this level, excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense. If the trial court missteps, the trial court's ruling is merely an error of law; there is no refusal to allow a defendant to present a defense, but only a rejection of some evidence concerning the defense.

See Opinion at 15, attached to Petition.

**A. Cross-examination of A.N. regarding her truthfulness in another matter**

Petitioner first claims the trial court violated his federal due process rights by precluding Petitioner from cross-examining victim A.N. as to whether she lied to police in another case.

During direct examination, the prosecutor elicited the fact that A.N. was the subject of a juvenile adjudication subsequent to her encounter with Petitioner. She testified that she had been adjudicated an accessory after the fact to a felony. The following exchange took place on cross-examination:

cd

9

| | |
|---|---|
| 1 | Q [Defense counsel]: Okay. Now, Mr. MacMichael [Prosecutor] asked you some questions about your juvenile adjudication in 2005? |
| 2 | A. Yes. |
| 3 | Q. That was for shooting, was it not? |
| 4 | A. Yes. |
| 5 | Q. So what you were convicted of was being an accessory to a shooting; is that right? |
| 6 | A. Yes. |
| 7 | Q. And when you were first questioned by the police about that, did you deny any involvement? |
| 8 | |
| 9 | [Prosecutor Mr. MacMichael]: Objection, relevance. |
| 10 | [Defense counsel Ms. Schultz]: It goes to her credibility, your Honor. |
| 11 | [Prosecutor]: It's already been - the adjudication has already been put into evidence, and I don't think any further details are relevant. |
| 12 | [Defense counsel]: Judge, if I could be heard at a sidebar possibly? |
| 13 | The Court: Yes. Give me just a moment. |
| 14 | (Sidebar discussion held, not reported.) |
| 15 | The Court: All right. The Court's going to rule on the objection that was raised to the question of whether - the question that was raised by Ms. Schultz was whether the witness had been untruthful with law enforcement in a - in the case which she acknowledged having a juvenile conviction. With respect to the objection of the People, the object[ion] is sustained under the authority of Evidence Code Section 787 and 352, the Court having weighed matters in determining that the use of time exceeds any probative value. |
| 16 | |
| 17 | |
| 18 | |
| 19 | Ms. Schultz: Thank you, your Honor. |
| 20 | Q. [A.N.], are you still on juvenile probation as a result of that conviction? |
| 21 | Mr. MacMichael: Objection, relevance. |
| 22 | The Court: Overruled, under authority of <u>Davis v. Alaska</u>. |
| 23 | The Witness: Yes. |
| 24 | Q [Defense counsel]: And for how long will you continue to be on probation? |
| 25 | Mr. MacMichael: Same objection. |
| 26 | The Court: Sustained. |
| 27 | <u>See</u> Opinion at 12-13, attached to Petition. |
| 28 | The trial court did not deny Petitioner his right to confront A.N. by limiting cross- |

examination on the juvenile adjudication. First, the juvenile adjudication took place subsequent to the instant offense; the adjudication was not for past statements to police. Petitioner submits no authority addressing admissibility of after-the-fact credibility evidence. Moreover, the fact of the witness's juvenile adjudication was presented to the jury. The jury was also informed of the reason for the adjudication: accessory after the fact to a felony shooting. The jury was also told the victim was still on probation. Thus, the defense was not denied an opportunity to attack the victim's credibility. The trial court did not abuse its discretion in limiting further inquiry into what would have been repetitive and only marginally relevant evidence.

  Even if the trial court committed constitutional error, Petitioner must still demonstrate, "assuming that the damaging potential of the cross-examination were fully realized, . . . that the error was harmless beyond a reasonable doubt." Van Arsdall, 475 U.S. at 684. In reviewing state court decisions for harmless error in the context of a habeas petition, federal courts review to determine if the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993), *quoting* Kotteakos v. United States, 328 U.S. 750, 776 (1946); see Fry v. Pliler, 551 U.S. 112 (2007). "If a habeas court is left with 'grave doubt' about whether a constitutional error substantially influenced the verdict, then the error was not harmless." Parle v. Runnels, 387 F.3d 1030, 1044 (9th Cir.2004). In making this inquiry, the court must review the record to determine "what effect the error had or reasonably may be taken to have had upon the jury's decision." McKinney v. Rees, 993 F.2d 1378, 1385-86 (9th Cir.1993), *quoting* Kotteakos, 328 U.S. at 764. In any particular case the relevant factors include "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." Id.

  In this case, there was overwhelming physical evidence presented to the jury. An examination of A.N. at University Medical Center discovered sperm in her vagina which had genetic markers matching Petitioner that were expected to randomly occur in only one of 180 quadrillion Hispanics. In addition, the investigating nurse observed "erythema" or redness on A.N.'s cervix as well as

whitish discharge. When Petitioner was asked whether he had sexual intercourse with A.N. or any of the other victims, be it consensual or not, "He responded in the three and a half years prior he hadn't had sex with anybody consensually or nonconsensually, other than his wife." See Opinion at 17, attached to Petition. In light of the evidence and the fact that further inquiry into A.N.'s juvenile adjudication would have been cumulative, there is no question that the trial court's decision to limit cross-examination did not have "a substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 623.

**B. Cross-examination of D.B. regarding extent of her prior marijuana use**

Petitioner next claims the trial court committed constitutional error depriving him of his due process rights when it precluded cross-examination of victim D.B. regarding the extent of her prior marijuana usage.

On direct examination, the following exchange took place:

Q. [Prosecutor Mr. MacMichael]: Okay. And then what happened?

A. [Witness D.B.]: Well, we - well, after that he asked if I smoked weed, and I said, well, yes, I smoke weed and he said - he offered me some, so we took off to - [¶] . . . [¶]

Q. When you said weed, what do you mean by weed?

A. Well, pot, drugs.

Q. Okay. So pot, weed, what's the actual name for that?

A. Marijuana. [¶] . . . [¶]

Q. Okay. So then, so after that, after he offered you that, did you start talking to him then?

A. Umm, I guess, yeah, you could say that.

Q. Okay. And then did he - were you afraid of him at that point?

A. Not so much, but I just . . . he just talked to me about that he lived nearby, and just simple questions you would ask people that you barely meet. [¶] . . . [¶]

Q. Okay. And so were you walking on streets at this time?

A. Yes. We were still walking on Blackstone - well, we were cutting - when he was asking me these questions we were still walking on Blackstone, and then finally made a turn towards the canal. [¶] . . . [¶]

Q. Okay. When you got to the other side [of the canal], what did you do?

A. We walked while - he said that there's a little area where we can probably smoke at, and

then we went towards where he raped me at.

See Opinion at 18-19, attached to Petition.

On cross-examination, the following exchange took place:

Q. [Defense counsel Ms. Schultz]: And then at some point he [Petitioner] asked if you wanted to get high; is that right?

A. Yes.

Q. And then he told you that he had some marijuana with him; isn't that right?

A. Yes.

Q. And so you went with him to smoke the marijuana; is that right?

A. Umm, I was - he really just said that there was a shortcut. He said there was a shortcut, so might as well take the shortcut, and we were going to do that.

Q. And you just -

A. I'm not lying. I'm just telling you what.

Q. I understand. You told Officer Garrison that this man said I've got some marijuana, do you want to get high, and you said yes, and that's when you went with him?

A. Yeah.

Q. Okay. So the two of you walked to a place that he said he knew; is that right?

A. Not towards a particular place, just towards my house. We were walking to my house.

Q. Along the canal?

A. Yes. He just said you can cut through there, basically, and just smoke the weed on the canal while we were walking.

Q. And did you in fact light up?

A. No, I didn't.

Q. You didn't?

A. Huh-uh.

Q. You didn't. All right. [¶] Before that date in November, November 17th, on how many occasions had you smoked marijuana?

A. I haven't -

Mr. MacMichael: Objection.

The Court: Sustained.

See Opinion at 19-20, attached to Petition.

This claim also fails. As noted by the appellate court in its opinion, the defense failed to make an offer of proof thereby failing to preserve the alleged error on appeal. Petitioner has thus procedurally defaulted this claim. As Petitioner does not argue that there was cause for his default or that failure to consider the merits of his claim will result in a fundamental miscarriage of justice, federal habeas review is procedurally barred. See Coleman v. Thompson, 501 U.S. 722, 750 (1991).

In any case, there is no merit to the claim. There was overwhelming physical evidence that Petitioner had raped the victim. Examination of the victim D.B. revealed she had scratches to her face and was tearful. She had linear abrasions on her back and the lower portion of her shoulder blades. She had abrasions on her knees and knuckles. She had a scratch on the side of her face and the side of her nose. White mucus was discovered during a pelvic exam. D.B.'s jeans also bore traces of semen from which DNA was recovered showing Petitioner was a donor of the fluid. When Petitioner was questioned about the crime, he denied he had any knowledge of a rape and that "in the three and a half years prior he hadn't had sex with anybody consensually or non-consensually, other than his wife." See Opinion at 21-22, attached to Petition. The trial court's decision to limit cross-examination on the issue of D.B's marijuana usage could not have had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 623.

**C. Cross-examination of I.P. regarding extent of her knowledge of crystal methamphetamine**

Finally, Petitioner claims the trial court abused its discretion in precluding cross-examination of victim I.P. concerning her knowledge of crystal methamphetamine.

The following exchange took place on cross-examination of I.P.:

Q. [Defense counsel Ms. Schultz]: And when you were interviewed by Officer Buller, you told him step-by-step what happened August 25th; is that correct?

A. [Victim I.P.]: Yes, I did.

Q. And were you honest and truthful with him?

A. Yes, I was.

Q. And you were interviewed by Officer Buller at Saint Agnes; is that correct?

A. Yes.

| | |
|---|---|
| 1 | Q. And within - at the outside two hours of this incident? |
| 2 | A. Yes. |
| 3 | Q. And so your memory was fairly fresh at that time; is that correct? |
| 4 | A. Yes. |
| 5 6 | Q. Okay. Going back to the bus stop where you saw, where you first started talking to this man, do you remember telling Officer Buller that he said - he asked you whether you were interested in buying or using some crystal meth? |
| 7 | A. No. |
| 8 | Q. Did you tell Officer Buller that he asked you if you wanted to buy any weed? |
| 9 | A. Yes. |
| 10 | Q. Was there ever any mention of crystal meth in your conversation with this man? |
| 11 | A. No. |
| 12 | Q. Do you know what crystal meth is? |
| 13 | A. Yes. |
| 14 | Q. And how do you know? |
| 15 | A. Because I know what it is. |
| 16 | Q. And how do you know is the question? |
| 17 | A. Because I've heard of it before. |
| 18 | Q. You've heard of it before? |
| 19 | A. Correct. |
| 20 | Q. Okay. You've never seen it? |
| 21 | A. No. |
| 22 | Mr. MacMichael: Judge, relevance. |
| 23 | The Court: Sustained. |
| 24 | Ms. Schultz: Goes to her knowledge, your Honor. Goes to her credibility. |
| 25 | The Court: Overruled - I'll sustain the objections. Continue to sustain the objection. |

See Opinion at 23-24, attached to Petition.

This claim also must fail. Even assuming the trial court should have allowed further inquiry into the victim's knowledge of crystal methamphetamine, the error was harmless. As with the

previous two claims, there was overwhelming physical evidence that Petitioner had forcibly raped the victim. During the medical examination, the sexual assault forensic examiner documented bruises to I.P.'s back, redness in the middle of her back, bruises to her forehead in her hairline, and pinpoint bruises to the back of her throat. The examiner also discovered dirt in I.P.'s vagina and cervix and noted redness in the vaginal pool underneath the cervix. I.P. complained of much discomfort during the exam. Nine different white-colored stains were located on I.P.'s shirt and tested. In every area, the profile of the sperm matched Petitioner. Further, when Petitioner was questioned by investigators regarding the rape, he denied knowing I.P. and stated he hadn't had sexual intercourse with anyone other than his wife for the past three and a half years. See Opinion at 25-26, attached to Petition. There is no doubt the alleged error did not have "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623.

In sum, Petitioner has failed to demonstrate that the state court rejection of his claims "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). The petition should be denied.

**RECOMMENDATION**

Accordingly, the Court RECOMMENDS that the petition for writ of habeas corpus be DENIED. It is FURTHER RECOMMENDED that the Clerk of Court be DIRECTED to enter judgment for Respondent.

This Findings and Recommendation is submitted to the Honorable Lawrence J. O'Neill, United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days (plus three days if served by mail) after being served with a copy, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within ten (10) court days (plus three days if served by mail) after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to

28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated: **April 21, 2009**              **/s/ Gary S. Austin**
                                       UNITED STATES MAGISTRATE JUDGE